FILED
COURT OF APPEALS
DIVISION II

2014 NOV 25 AM II: 19

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | | |
|---|---|---|
| STATE OF WASHINGTON, | | No. 43930-1-II |
| Respondent, | | |
| v. | | |
| JEFFREY ALLEN TREBILCOCK, | | Consolidated with |
| Appellant. | | |
| STATE OF WASHINGTON, | | No. 43950-6-II |
| Respondent, | | |
| v. | | |
| REBECCA TREBILCOCK, | | PUBLISHED IN PART OPINION |
| Appellant. | | |

MELNICK, J. — Jeffrey and Rebecca Trebilcock appeal their bench trial convictions and sentences for criminal mistreatment in the first degree of J.T. and criminal mistreatment in the third degree of A.T. We reject Rebecca's[1] arguments that her sentence violates due process because the trial judge relied on his own personal religious preferences when sentencing her, her exceptional sentence violates her Sixth and Fourteenth Amendment rights to a jury determination of aggravating factors, and her exceptional sentence improperly relies on impermissible factors. In the unpublished portion of this opinion, we reject the Trebilcocks' other arguments except for Jeffrey's individual argument that the trial court improperly imposed substance abuse treatment

---

[1] To avoid confusion, we refer to Jeffrey and Rebecca Trebilcock by their first names and intend no disrespect.

as part of his sentence. We remand for the trial court to strike the substance abuse treatment from Jeffrey's sentence. We otherwise affirm the Trebilcocks' convictions and sentences.

FACTS

The Trebilcocks lived in rural Cowlitz County. They have four biological sons and in 2004, began adopting children. The Trebilcocks first adopted two biological siblings: J.T., born in 1997, and A.T., born in 1999. Subsequently, the Trebilcocks adopted three more children: N.T., born in 1999, T.T., born in 2001, and G.T., born in 2002.

J.T., N.T., and A.T. experienced severe neglect and abuse while living with the Trebilcocks. The children were not allowed to try different foods. The Trebilcocks would make J.T. and occasionally A.T. eat from a "pig trough." 3B Report of Proceedings (RP) at 646. J.T. and A.T. would also be forced to eat outdoors in the cold. The children would be denied food altogether if they did not complete their chores or schoolwork. On occasion, they would have to steal food to survive, from bread and fruit to dog food, goat food, and toothpaste. The Trebilcocks put an alarm in the kitchen to prevent the children from stealing food. When the Trebilcocks caught the children stealing food, they would spank the children with a wooden paddle.

J.T. in particular spent a great deal of time outside doing chores barefoot. In order to ensure that he did not get the carpet dirty, he had to have his feet checked before he entered the house. At times J.T. would stand outside in the cold for hours, waiting for someone to check his feet so he could go back inside. The Trebilcocks made J.T. wash his clothes outside in a bucket and hang them to dry. Sometimes his clothes would not dry and he had to wear wet clothing. J.T. also had to wash his bed sheets in the bucket outside, and if the sheets did not dry, he had to sleep without sheets. He was frequently cold at night.

The Trebilcocks' actions gravely affected J.T.'s health and development. Between the ages of six and thirteen, J.T. lost weight, going from a "slightly above average" weight to less than the third percentile. 6B RP at 1358. As early as 2008, medical professionals recognized that J.T. "did not have anything close to normal growth for his age." 6B RP at 1321. In March 2011, J.T. was brought to a pediatric clinic in a "nearly dead" state. 6B RP at 1368. J.T. could not walk without stumbling. He was trembling and had significant hypothermia. He had a heart rate equivalent to one of an unconscious child's. He weighed 49 pounds, stood 50 inches tall, had a concave stomach, and looked malnourished. His muscles were wasting and his bones were visible. He suffered from untreated eczema which had bacterial overgrowth. Two different doctors agreed that J.T. appeared very thin and small for his age—although he was then 13 years old, J.T. looked closer to 6 to 7 years old. Dr. Danielle Parrot determined that J.T. was in critical condition and sent him to the emergency room of the local hospital. There, the medical staff stabilized J.T. and then transferred him to the pediatric intensive care unit (ICU) at Doernbecher Children's Hospital.

At the ICU, Dr. Thomas Valvano, a pediatrician and the medical director of the Suspected Child Abuse and Neglect Program, examined J.T. and found him to be "cachectic, just very malnourished, no subcutaneous fat, very thin." 6A RP at 1125. Dr. Valvano found J.T.'s case unusual and troubling because ordinarily, J.T. would be expected to remain in the same percentile range for his entire life. Yet after he moved in with the Trebilcocks, J.T.'s weight and height dropped from the fiftieth percentile to the third percentile in comparison to other boys his age. Dr. Valvano discovered no medical reasons for J.T.'s cachectic state and believed malnourishment caused J.T.'s condition. Dr. Valvano bolstered his medical analysis with the fact that J.T. gained weight and thrived after he ate a normal diet in the hospital over a period of

eight days. Based on Dr. Valvano's review of J.T.'s records, his examination of J.T., and J.T.'s progress and improvement at the hospital, Dr. Valvano opined to a reasonable medical certainty that improper exposure to cold weather caused J.T.'s hypothermic state and that not being given enough food to eat caused J.T.'s malnourishment.

The day after J.T.'s hospitalization, Child Protective Services (CPS) opened an investigation into the Trebilcocks. The Trebilcocks' four adopted daughters appeared frightened and very thin when CPS visited. According to Jeffrey, the girls were on a special vegan diet and were not allowed to have any sweets. Rebecca refused CPS's request to have the four adopted girls see a doctor.

CPS soon placed J.T. and the four girls into their custody. When CPS supervisor Stephanie Frost picked the girls up, they were very withdrawn and would not talk. Frost found this unusual based on her eight years of experience. CPS barred the Trebilcocks from visiting J.T. at the hospital.

J.T. began a dramatic recovery once CPS removed him from the Trebilcocks' care. In the 16 months after he moved out of the Trebilcocks' home, J.T. grew seven and a half inches and more than doubled his weight, gaining 64 pounds. Dr. Blaine Tolby opined that J.T.'s living conditions at the Trebilcocks' had caused his poor growth. Dr. Tolby testified J.T. suffered incredible harm and that he "would place the severity of this particular case, as being the worst case of chronic abuse and neglect" that he had seen in his 37 years of being a physician. 7A RP at 1463.

Similarly, A.T. suffered a precipitous loss of weight while in the Trebilcocks' care, and began to recover once CPS removed her from the Trebilcocks' care. Before she lived with the Trebilcocks, A.T. was slightly heavier than average. Yet at the time she was removed from the

4

Trebilcocks' care, the twelve-year-old A.T. appeared thin and weighed only 51 pounds, 12 ounces and stood 51 inches tall. That put her body mass index (BMI) at 14, below the third percentile. She also "lost some relative height." 6B RP at 1370. Andrea Street, a registered dietician, testified that A.T. remained underweight even three weeks after being removed from the Trebilcocks' care. 5 RP at 1021.

In less than three months of foster care, A.T. grew to 70.4 pounds and 52.25 inches, at the tenth percentile for weight and height. Dr. Kenneth Wu opined that A.T.'s low intake of food likely caused her low weight and BMI.

PROCEDURAL HISTORY

On May 24, 2011, the State charged the Trebilcocks with five counts of criminal mistreatment against their five adopted children. On June 15, Jeffrey and Rebecca waived their right to jury trials. Both signed written waivers and the trial court conducted a colloquy with both to ensure they each understood their rights and were voluntarily waiving their right to jury trials. Jeffrey's trial attorney stated that the Trebilcocks' decision to waive a jury trial had been discussed over a period of several months. The State twice amended the information, charging the Trebilcocks on July 23 with 13 counts of domestic violence criminal mistreatment against their five adopted children with four aggravating factors.

After a bench trial, the trial court found Jeffrey and Rebecca guilty of criminal mistreatment in the first degree with domestic violence of J.T. (count 1) and criminal mistreatment in the third degree with domestic violence of A.T (count 3) and acquitted Jeffrey and Rebecca of the remaining counts. The court also found two aggravating factors pertaining to count 1: first, the crime involved domestic violence that was part of an ongoing pattern of psychological and physical abuse, and second, the Trebilcocks used their position of trust,

confidence, or fiduciary responsibility to commit the crime. At the sentencing hearing, the trial court commented on Rebecca's testimony about her biblical convictions on diet and contrasted Rebecca's conduct with "the importance of safeguarding and protecting children in our society and keeping them from harm and offense." 11 RP at 2729-30. The court then referenced a biblical quote:

> This is the phrase that some of you may be familiar with: "Which one of you, if his son asks him for bread, will he give them a stone, or if he asks [sic] a fish, will he give him serpent?" Your children asked for bread and for reasons which baffle, literally baffle the bulk of society, you gave them a stone.

11 RP at 2730.

The trial court sentenced Jeffrey to a standard range sentence of 60 months on count 1 and 364 days on count 3, to be served consecutively. The trial court also ordered Jeffrey to undergo treatment and evaluation for substance abuse as a condition of his misdemeanor criminal mistreatment in the third degree conviction. Based on the two aggravating factors, the trial court sentenced Rebecca to an exceptional sentence above the standard range and found that the grounds for the aggravating circumstances "taken together or considered individually, constitute sufficient cause to impose the exceptional sentence" of 96 months on count 1 and 364 days on count 3, to be served consecutively. CP (filed at COA Oct. 9, 2013) at 10. Both Jeffrey and Rebecca appeal.

## ANALYSIS

I.   SENTENCE NOT BASED ON THE TRIAL COURT'S RELIGIOUS BELIEFS

Rebecca first argues the trial judge violated her Fourteenth Amendment[2] right to due process by considering his own religious beliefs in setting the length of her sentence, and thus

---

[2] "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

her sentence must be vacated and her case remanded for resentencing before a different judge. This is an issue of first impression in Washington State. Because the trial judge did not inject his own personal religious beliefs into sentencing or sentence Rebecca based solely on those beliefs, we hold no constitutional violation occurred and we affirm Rebecca's sentence.

The sentencing process must satisfy the requirements of due process. *Gardner v. Florida*, 430 U.S. 349, 358, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977). We review constitutional challenges de novo. *State v. Vance*, 168 Wn.2d 754, 759, 230 P.3d 1055 (2010).

Federal case law prohibits a judge from making his own "personal religious principles" the explicit basis of a sentencing decision. *United States v. Bakker,* 925 F.2d 728, 741 (4th Cir. 1991). In *Bakker*, when sentencing a well-known televangelist for mail and wire fraud, the district court said, "He had no thought whatever about his victims and *those of us who do have a religion* are ridiculed as being saps from money-grubbing preachers or priests." 925 F.2d at 740 (emphasis added). The court held that this statement was error because a judge's religious beliefs are irrelevant for sentencing purposes, and therefore due process is violated when a judge "impermissibly takes his own religious characteristics into account in sentencing." 925 F.2d at 740.

On the other hand, numerous federal courts agree that it is not reversible error for a court to use religious language to express a secular concept. In *Gordon v. Vose*, 879 F. Supp. 179, 184 (D.R.I. 1995), the state sentencing court referred to a biblical verse: "no man should take more than he is willing to give." The district court affirmed because the sentencing court did not express a personal religious preference or bias, but merely articulated a secular principle: "that if one commits a serious crime, he must expect to receive a severe punishment." *Gordon*, 879 F. Supp. at 185.

7

In *United States v. Traxler*, 477 F.3d 1243, 1248 (10th Cir. 2007), the court explicitly referred to the biblical letters of Paul, stating, "[G]ood things can come from jail. A guy named Paul was put in jail a couple thousand years ago and wrote a bunch of letters from jail . . . and people are still reading those letters and being encouraged by them and finding hope in them thousands of years later." The court rejected the defendant's due process challenge, concluding the judge's comments in no way suggested Traxler needed a longer sentence to "pay religious penance." *Traxler*, 477 F.3d. at 1249. Instead, the religious reference was meant to convey a secular message: "that something good can come from difficult circumstances, even jail." *Traxler*, 477 F.3d at 1249.

In *Arnett v. Jackson*, 393 F.3d 681, 683 (6th Cir. 2005), the Sixth Circuit similarly affirmed where the trial court merely referenced religion in order to convey a secular principle. There, the trial court quoted two verses from the Bible when sentencing the defendant on numerous counts of rape of a minor. The Sixth Circuit held that the trial court's comments did not violate Arnett's due process rights because the sentencing judge made no reference to her own religious beliefs; instead, one plausible interpretation of the Biblical quotation was that it underscored "that our society has a long history of sternly punishing those people who hurt young children." *Arnett*, 393 F.3d at 687. The Sixth Circuit held that although reasonable minds could question the sentencing court's mentioning the Bible, the sentencing court properly considered numerous aggravating and mitigating factors. *Arnett*, 393 F.3d at 687.

Similarly, numerous state supreme courts have affirmed sentences where the judge's religious comments merely acknowledge generally accepted principles rather than basing sentences on highly personal religious beliefs. *See, e.g., State v. Arnett*, 88 Ohio St. 3d 208, 221-22, 724 N.E.2d 793 (Ohio 2000) (upholding sentence because biblical reference was not the sole

basis for the sentences, but was one of many factors the trial judge considered); *Poe v. State*, 341 Md. 523, 533, 671 A.2d 501 (Md. 1996) (upholding sentence when sentencing judge said, "I still believe in good old-fashioned law and order, the Bible, and a lot of things that people say I shouldn't believe anymore" prior to sentencing); *Gordon v. State*, 639 A.2d 56, 56 (R.I. 1994) (upholding sentence when sentencing judge referred to the Bible by saying that "no man takes more than he's willing to give"); *People v. Halm*, 81 N.Y.2d 819, 820, 611 N.E.2d 281 (1993) (upholding sentence for sodomy when sentencing judge referred to "Biblical times" and expressed his opinion about the seriousness of the crime).

Here, during sentencing, the trial judge referenced a biblical quote when he stated:

> At trial, Mrs. Trebilcock testified about being biblically convicted about proper eating and diet.
> This may be familiar to some—this phrasing—and the reason I make mention of this is because I really think it's important to mention and underscore the importance of safeguarding and protecting children in our society and keeping them from harm and offense. This is the phrase that some of you may be familiar with: "Which one of you, if his son asks him for bread, will he give them a stone, or if he asks a fish, will he give him serpent?" Your children asked for bread and, for reasons which baffle, literally baffle the bulk of society, you gave them a stone.

11 RP at 2729-30. Like the biblical references in *Gordon v. Vose* and *Traxler*, this reference merely underscores a secular principle: "safeguarding and protecting children in our society." 11 RP at 2729. And as in *Arnett v. Jackson* and *State v. Arnett*, the biblical reference constituted only one of many factors the sentencing judge considered in imposing Rebecca's sentence.

Here, the trial court relied on the fact that the children were left "damaged, sick, and, in the case of [J.T.], nearly dead." 11 RP at 2728. The trial court relied on the length of the ongoing abuse. The trial court relied on evidence at trial that the children only gained "seven pounds in seven years" and that "[t]here was rationing, there was withholding, there was even

the dramatic step of setting up motion alarms to prevent the children from eating." 11 RP at 2729. The trial court relied on the fact that Rebecca had ample opportunity to observe the condition of the children and should have noticed that J.T. was in distress "from five broken ribs." 11 RP at 2731. The record makes it amply clear that the trial court based its sentence on the totality of the facts and the severity of the Trebilcocks' "woefully derelict and shamefully deficient" caretaking. 11 RP at 2729.

Further, the trial court made the biblical reference in response to the Trebilcocks introducing the issue of religion and biblical authority into the proceedings. Specifically, Rebecca testified that she felt "biblically convicted" to follow a limited and vegan diet for herself and the children. 10A RP at 2348. We hold that the trial court did not inject his own personal religious beliefs into the sentencing hearing and that the court did not violate Rebecca's due process rights.

II.    REBECCA'S SENTENCE DID NOT VIOLATE SIXTH AND FOURTEENTH AMENDMENT RIGHTS

Rebecca also argues that her exceptional sentence violated her Sixth and Fourteenth Amendment rights to a jury determination of aggravating factors. Specifically, Rebecca argues that because she waived her jury trial right before the State amended the information to add the aggravating factors, her waiver applied only to a finding of guilt on the charges and not to a determination of the aggravating factors. We disagree. Because Rebecca validly waived her right to a jury trial,[3] acquiesced to the trial court determining the aggravating factors, and never attempted to revoke her waiver, we affirm her exceptional sentence.

A criminal defendant has the right to have a jury decide any aggravating factor that supports an exceptional sentence. *Blakely v. Washington*, 542 U.S. 296, 302, 124 S. Ct. 2531,

---

[3] Rebecca's jury trial waiver is discussed in more detail in the unpublished portion of this opinion.

10

159 L. Ed. 2d 403 (2004). A criminal defendant, however, may waive that right. *State v. Hughes*, 154 Wn.2d 118, 133-34, 110 P.3d 192 (2005) (citing *Blakely*, 542 U.S. at 310), *abrogated on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). The filing of an amended information, standing alone, does not render a defendant's waiver of a right ineffective. *See State v. Modica*, 136 Wn. App. 434, 445-46, 149 P.3d 446 (2006) (upholding waiver of counsel that occurred prior to amended information being filed). Instead, we look to the specific facts of the case. "[A] record sufficiently demonstrates a waiver of the right to trial by jury if the record includes either a written waiver signed by the defendant, a personal expression by the defendant of an intent to waive, or an informed acquiescence." *State v. Cham*, 165 Wn. App. 438, 448, 267 P.3d 528 (2011) (citing *State v. Stegall*, 124 Wn.2d 719, 729, 881 P.2d 979 (1994); *State v. Wicke*, 91 Wn.2d 638, 641-42, 591 P.2d 452 (1979)). The State bears the burden of establishing a valid waiver, and absent a record to the contrary, we indulge every reasonable presumption against waiver. *Cham*, 165 Wn. App. at 447. We review de novo the sufficiency of the record to establish a valid waiver. *Cham*, 165 Wn. App. at 447.

The record here amply demonstrates that Rebecca wanted to waive a jury for all purposes, including determining the aggravating factors alleged, even though her waiver occurred before the information was amended to add the aggravating factors. Defense counsel stated at the beginning of trial (prior to the amended information) that the decision to waive a jury had been discussed over a period of months between the parties. Rebecca indicated on the record that she understood she had the right "to have any . . . case heard by twelve of [her] peers" and that she was opting instead to have "a single person, a judge, hearing the case, making a decision." 1 RP at 61. Rebecca never moved to rescind her jury waiver or request a jury, even

when the State amended the information to add the aggravating factors. Instead, multiple times during trial, counsel stated that Rebecca understood and agreed that the trial judge would be deciding the aggravating factors. Specifically, when addressing an evidentiary objection, counsel admitted that certain evidence was admissible and would be considered by the trial court when considering the aggravating factors. In closing, counsel stated that certain evidence might go to the trial court's determination of the aggravating factors. All of these facts demonstrate a knowing, intelligent, and voluntary waiver of the jury to determine guilt and aggravating factors. They also establish Rebecca's informed acquiescence. *See Cham*, 165 Wn. App. at 449.

When the trial court found that two of the four alleged aggravating factors had been proven, Rebecca did not object to the trial court deciding the aggravating factors. At sentencing, defense counsel commented on the trial court's broad discretion for sentencing because of the aggravating factors the court found. Counsel also commented on the significant community interest and pretrial publicity in the Trebilcocks' case as a primary reason for waiving the jury. In other words, Rebecca's decision to waive a jury was a counseled, knowing, and voluntary strategic decision that Rebecca agreed to even after the State amended the information.

Rebecca's valid jury waiver at the beginning of the trial, as well as her informed acquiescence to her counsel's unchallenged statements, overcame any presumption that Rebecca did not make a knowing, intelligent, and voluntary waiver. Rebecca knew the role of the jury, made a strategic decision to waive the jury, and stood by her decision throughout proceedings. As such, she waived her right to have a jury determine whether the State proved aggravating factors beyond a reasonable doubt. We hold Rebecca's exceptional sentence does not violate her Sixth and Fourteenth Amendment rights to a jury determination of aggravating factors, and we affirm her exceptional sentence.

III.    REBECCA'S EXCEPTIONAL SENTENCE BASED ON PERMISSIBLE FACTORS

Rebecca next argues the trial court erred when it found the two aggravating factors and based an exceptional sentence on those factors. First, Rebecca argues that the abuse of trust aggravator does not apply because it applies only to crimes of intentional conduct, and because abuse of trust is inherently a part of the underlying crime of criminal mistreatment in the first degree. Second, Rebecca argues that the ongoing pattern aggravating factor does not apply because it applies only to domestic violence crimes, and because the ongoing pattern factor is inherently a part of the underlying crime of criminal mistreatment in the first degree. We hold the trial court properly found the ongoing pattern aggravating factor. Because the trial court found that *either* aggravating factor alone would have been sufficient grounds to impose the sentence, we affirm Rebecca's exceptional sentence without reaching her abuse of trust argument.

The State charged Rebecca with the aggravating factor which requires that the "current offense involved domestic violence, as defined in RCW 10.99.020, . . . and . . . [t]he offense was part of an ongoing pattern of psychological, physical, or sexual abuse of a victim or multiple victims manifested by multiple incidents over a prolonged period of time."[4] Under RCW 10.99.020, domestic violence "includes but *is not limited to*" a list of specific offenses "when committed by one family or household member against another." (Emphasis added.). Rebecca argues that because the statute does not specifically list criminal mistreatment, criminal mistreatment is not domestic violence and therefore the aggravator does not apply to the crime of criminal mistreatment in the first degree. We reject her argument because the statute plainly indicates that the list is "not limited to" the enumerated crimes. In addition, the unchallenged

---

[4] RCW 9.94A.535(3)(h)(i)

13

findings of fact are that Rebecca committed a crime against J.T., a family member, and caused him harm. Accordingly, the trial court properly concluded that the criminal mistreatment in the first degree involved domestic violence.

Rebecca next argues that the "ongoing pattern" of abuse aggravating factor inheres in criminal mistreatment in the first degree. Appellant's (Rebecca) Br. at 21. We disagree. To be guilty of criminal mistreatment in the first degree, "[a] parent of a child" must "cause[ ] great bodily harm to a child . . . by withholding any of the basic necessities of life." RCW 9A.42.020. To find the ongoing pattern aggravating factor, the fact finder must find that the abuse occurred over a "prolonged period of time." RCW 9.94A.535(3)(h)(i). Rebecca argues that the offense of criminal mistreatment in the first degree necessarily "requires an ongoing pattern, manifested by multiple 'incidents' over a prolonged period of time" and thus the ongoing pattern is already part of the criminal mistreatment in the first degree conviction. Appellant's (Rebecca) Br. at 21. We disagree. "Criminal mistreatment can occur over a few days or . . . over a much longer period of time." *State v. Rotko*, 116 Wn. App. 230, 245, 67 P.3d 1098 (2003). Criminal mistreatment in the first degree does not inherently imply an ongoing pattern, and thus we hold the trial court did not err when relying on the ongoing pattern aggravating factor when giving an exceptional sentence.

Rebecca also challenges the abuse of trust aggravating factor, but we do not reach that challenge. The trial court stated in its findings of fact and conclusions of law for an exceptional sentence that the aggravating factors, "taken together or considered individually, constitute sufficient cause to impose the exceptional sentence," and that it would "impose the same sentence if only one of the grounds listed in the preceding paragraph is valid." CP (filed Oct. 9, 2013) at 10. Because the "ongoing pattern of abuse" aggravating factor was established, the trial

court would have imposed the same sentence whether or not the abuse of trust aggravating factor applied. As a matter of law, the trial court did not rely on impermissible factors when imposing an exceptional sentence.

We hold that the trial court did not interject his personal religious beliefs into the sentencing hearing, that Rebecca's sentence did not violate her Sixth and Fourteenth Amendment rights to a jury determination of aggravating factors, and that permissible factors exist to uphold Rebecca's exceptional sentence. We address the Trebilcocks' remaining arguments in the unpublished portion of this opinion.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

In this section, we reject the Trebilcocks' joint arguments that their convictions violate their constitutional right to an independent determination of the facts because their convictions were based in part on impermissible opinion testimony; that their jury trial waivers were invalid; and that their criminal mistreatment in the third degree conviction should be reversed for insufficient evidence. We also decide Jeffrey's individual argument that the trial court improperly imposed substance abuse treatment as part of his sentence.

I.      OPINION TESTIMONY PROPERLY ADMITTED

The Trebilcocks both argue that their convictions were based on an impermissible expert opinion on their guilt, which violated their constitutional right to a jury trial. The State argues the Trebilcocks failed to object to the challenged testimony at trial and thus did not preserve this issue for appeal. Although Jeffrey and Rebecca objected generally to expert testimony giving an opinion on abuse, they did not specifically object to the statement they now challenge. Because

15

the challenged testimony did not provide an improper opinion on guilt, the Trebilcocks do not raise a manifest constitutional error and we will not review this issue.

We will not review an argument raised for the first time on appeal unless the challenging party demonstrates a manifest constitutional error. RAP 2.5(a)(3). To satisfy RAP 2.5(a)(3), an appellant first must identify a constitutional error and then demonstrate how the alleged error affected his rights at trial. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). An error is manifest if it is so obvious on the record that the error requires appellate review. *O'Hara*, 167 Wn.2d at 99-100. The defendant must show actual prejudice, meaning the alleged error had practical and identifiable consequences at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011).

Under ER 704, an expert may not testify about a defendant's guilt, either directly or by inference. *State v. Olmedo*, 112 Wn. App. 525, 530, 49 P.3d 960 (2002). "Such an improper opinion undermines a jury's independent determination of the facts, and may invade the defendant's constitutional right to a trial by jury." *Olmedo*, 112 Wn. App. at 530-31.[5] An expert's opinion, however, is not objectionable "simply because it embraces an ultimate issue the trier of fact must decide." *State v. Hayward*, 152 Wn. App. 632, 649, 217 P.3d 354 (2009); *see also* ER 704. "'[T]hat an opinion encompassing ultimate factual issues *supports* the conclusion that the defendant is guilty does not make the testimony an improper opinion of guilt.'" *Hayward*, 152 Wn. App. at 649 (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993)). A trial court's decision to admit expert testimony is reviewed for abuse of discretion. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

---

[5] Although the Trebilcocks had a bench trial, "the constitutional guaranty of an impartial trial *does not* distinguish between jury and bench trials." *State v. Read*, 147 Wn.2d 238, 249, 53 P.3d 26 (2002) (emphasis in original).

Here, Dr. Tolby, one of the State's expert medical witnesses, testified that that he "would place the severity of this particular case, as being the worst case of chronic abuse and neglect" that he had seen in his 37 years of being a physician. 7A RP at 1463. Although Dr. Tolby's testimony touched on an ultimate legal issue, the cause of J.T.'s condition, Dr. Tolby's testimony did not include any opinion regarding Jeffrey's and Rebecca's guilt, but rather simply stated his medical opinion that J.T.'s condition occurred because of abuse and neglect.

Additionally, "'in the absence of evidence to the contrary, we presume the judge in a bench trial does not consider inadmissible evidence in rendering a verdict.'" *State v. Gower*, 179 Wn.2d 851, 855, 321 P.3d 1178 (2014) (quoting *State v. Read*, 147 Wn.2d 238, 242, 53 P.3d 26 (2002)). This "presumption arises because of the 'unique demands' bench trials place on judges, 'requiring them to sit as both arbiters of law and as finders of fact.'" *Gower*, 179 Wn.2d at 855 (quoting *Read*, Wn.2d at 242). Indeed, the trial court's findings of fact do not reference Dr. Tolby's testimony except to note that the "growth charts and medical findings related to the expected growth" were credible. CP (filed May 28, 2013) at 29.

Dr. Tolby's expert testimony did not amount to an opinion on Jeffrey's and Rebecca's guilt; therefore, Dr. Tolby's testimony did not constitute manifest constitutional error.

II.    DEFENDANTS CAN WAIVE A JURY TRIAL

The Trebilcocks next argue that under article I, section 21 of the Washington State Constitution,[6] a criminal defendant may never waive a jury trial for a felony charge. The

---

[6] Article I, section 21 provides:

> The right of trial by jury shall remain inviolate, but the legislature may provide for a jury of any number less than twelve in courts not of record, and for a verdict by nine or more jurors in civil cases in any court of record and for waiving of the jury in civil cases where the consent of the parties interested is given thereto.

17

Trebilcocks argue that the six *Gunwall* factors "suggest[ ] that all felony cases in Washington must be tried to a jury, regardless of the parties' wishes." Appellant's (Rebecca) Br. at 27.

The Trebilcocks' argument is inconsistent with our decision in *State v. Benitez*, 175 Wn. App. 116, 126, 302 P.3d 877 (2013). Because *Gunwall* "addresses 'the extent of a right and not how the right in question may be waived,'" *Gunwall* is inapplicable. *Benitez*, 175 Wn. App. at 126-27 (quoting *State v. Pierce*, 134 Wn. App. 763, 773, 142 P.3d 610 (2006)). We further held in *Benitez* that "Washington law allows a defendant to waive a jury trial." *Benitez*, 175 Wn. App. at 127 (citing *Stegall*, 124 Wn.2d at 723. We reject the Trebilcocks' argument.

III. THE TREBILCOCKS KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVED THEIR RIGHT TO A JURY TRIAL

The Trebilcocks next argue that even if the right to a jury trial may be waived, their jury trial waivers were invalid. The Trebilcocks contend that because the Washington State constitutional right to a jury trial is broader than the federal right, a *Gunwall* analysis must be used to determine whether more extensive protections are required to waive the right. The Trebilcocks recognize that we rejected the same argument in *Pierce*, 134 Wn. App. 763, but argue that *Pierce* was wrongly decided and that we should overturn it here. We rejected this same argument in *Benitez* and do so again. Further, because Jeffrey and Rebecca knowingly, intelligently, and voluntarily waived their rights to a jury trial, we hold their waivers were valid.

We review a jury trial waiver de novo. *State v. Ramirez-Dominguez*, 140 Wn. App. 233, 239, 165 P.3d 391 (2007). The sufficiency of the record to satisfy the constitutional requirements for waiver of the fundamental right to a jury trial may be raised for the first time on appeal. *State v. Wicke*, 91 Wn.2d 638, 644, 591 P.2d 452 (1979). The record must adequately establish that the defendant waived his right knowingly, intelligently, and voluntarily. *Pierce*, 134 Wn. App. at 771. A written waiver "is strong evidence that the defendant validly waived the

18

jury trial right." *Pierce*, 134 Wn. App. at 771. An attorney's representation that the defendant's waiver is knowing, intelligent, and voluntary is also relevant. *Pierce*, 134 Wn. App. at 771 (citing *State v. Woo Won Choi*, 55 Wn. App. 895, 904, 781 P.2d 505 (1989)). Washington law does not require an extensive colloquy on the record; instead "only a personal expression of waiver from the defendant" is required. *Pierce*, 134 Wn. App. at 771 (citing *Stegall*, 124 Wn.2d at 725). As a result, the right to a jury trial is easier to waive than other constitutional rights. *Pierce*, 134 Wn. App. at 772 (citing *State v. Brand*, 55 Wn. App. 780, 786, 780 P.2d 894 (1989)).

Here, Jeffrey and Rebecca were informed that they had the right to have their case heard by an impartial jury, that they could take part in the jury selection process, and that in a jury trial the State would have to convince twelve citizens of their guilt beyond a reasonable doubt, whereas in a bench trial the State had to convince only the judge of their guilt beyond a reasonable doubt. Both Jeffrey and Rebecca signed written jury waivers stating that they understood the rights they were giving up, that they had consulted with an attorney regarding their decisions, and that they were voluntarily giving up their right to be tried by a jury. In a colloquy with the trial court, Jeffrey and Rebecca also confirmed that they wished to waive their right to a jury trial. Jeffrey's attorney also stated that Jeffrey and Rebecca "signed the waiver of a jury trial. It was, after being discussed over a period of months now, been decided that this is how both Parties want to proceed." 1 RP at 60.

The Trebilcocks argue that they were insufficiently apprised of their rights because their written waiver did not make clear that they understood they were entitled to a fair and impartial jury or that the jury would be instructed on the presumption of innocence. But Washington courts have "not required that a defendant be apprised of every aspect of the jury trial right in

order for the defendant's waiver to be valid." *Benitez*, 175 Wn. App. at 129 (citing *Pierce*, 134 Wn. App. at 773). Further, the Trebilcocks were "not required to be informed of '[their] right to be presumed innocent until proven guilty beyond a reasonable doubt or [their] right to an impartial trier of fact because these rights are inherent in all trials' and are not waived by waiving the right to a jury trial." *Benitez*, 175 Wn. App at 129 (quoting *Pierce*, 134 Wn. App. at 772). Accordingly, we hold that both Rebecca and Jeffrey made knowing, intelligent, and voluntary waivers of their right to a trial by jury.

IV.  SUFFICIENT EVIDENCE SUPPORTS THE TREBILCOCKS' THIRD DEGREE CRIMINAL MISTREATMENT CONVICTION

The Trebilcocks next argue that the evidence is insufficient to support their convictions for criminal mistreatment in the third degree of A.T because there was insufficient evidence of substantial bodily harm. We disagree and hold there is sufficient evidence that Jeffrey and Rebecca caused A.T. substantial bodily harm and affirm Jeffrey's and Rebecca's criminal mistreatment in the third degree convictions.

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). Specifically, following a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law. *Homan*, 181 Wn.2d at 105-06. "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise. *Homan*, 181 Wn.2d at 106. We treat unchallenged findings of facts and findings of fact supported by substantial evidence as verities on appeal. *Homan*, 181 Wn.2d at 106. We review challenges to a trial court's conclusions of law de novo. *Homan*, 181 Wn.2d at 106.

A. Findings of Fact

Here, the Trebilcocks only challenge finding of fact 34 that states:

> For a period of approximately seven years, the defendants also withheld food, a necessity of life, from A.T. The defendants used food as a punishment and reward for A.T., and would intentionally withhold food from her if she was disobedient. As a result of this withholding, A.T. suffered substantial bodily injury, to include very low body weight and growth stunting, and she was also placed at imminent and substantial risk of substantial bodily harm.

CP (filed May 28, 2013) at 31. Because this finding of fact is supported by substantial evidence, we reject their argument.

The evidence at trial supported a finding that the Trebilcocks withheld food from A.T. in order to punish her. A.T. testified that both Jeffrey and Rebecca withheld food if she had not completed her chores or schoolwork, that she was frequently hungry even after eating, and that the Trebilcocks rarely gave her more food if she asked for more. A.T. testified that sometimes the Trebilcocks made her eat outside and that she was cold because she did not have a coat on.

Furthermore, the evidence at trial supported a finding that as a result of this withholding, A.T. suffered substantial bodily injury and was put at imminent and substantial risk of substantial bodily harm. Substantial bodily harm means "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b). The State's medical evidence demonstrated that A.T. was below the third percentile for height and weight when she was removed from the Trebilcocks' home and that her condition put her at a greater risk for infection and disease. Specifically, for a child as malnourished as A.T. was, a routine "minor gastroenterology issue . . . may result in [ ] death." 6B RP at 1372. This evidence was sufficient to persuade a fair-minded person that the Trebilcocks' withholding of food put A.T. at severe risk and impaired her ability to grow and

21

live a normal life. We hold that finding of fact 34 is supported by substantial evidence and is thus binding on appeal.

B.     Conclusions of Law

The Trebilcocks challenge conclusion of law 5, which states that the elements of criminal mistreatment in the third degree were proved beyond a reasonable doubt. We disagree and affirm the trial court.

A person is guilty of criminal mistreatment in the third degree

> if the person is the parent of a child . . . and either: (a) With criminal negligence, creates an imminent and substantial risk of substantial bodily harm to a child or dependent person by withholding any of the basic necessities of life; or (b) With criminal negligence, causes substantial bodily harm to a child or dependent person by withholding any of the basic necessities of life.

RCW 9A.42.035. A person "acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d). We hold that the findings of fact support a conclusion that the Trebilcocks were guilty of criminal mistreatment in the third degree.

Unchallenged findings of fact 28 and 29 show that the Trebilcocks were A.T.'s parents. Unchallenged finding of fact 35 establishes that the Trebilcocks acted with criminal negligence. Finding of fact 34, which is supported by substantial evidence, establishes that the Trebilcocks caused substantial bodily harm to A.T. and put her at imminent and substantial risk of substantial bodily harm by withholding basic necessities of life. Accordingly, we hold that the findings of fact support conclusion of law 5 and we affirm.

22

V.   ERROR TO IMPOSE SUBSTANCE ABUSE TREATMENT AS PART OF JEFFREY'S PROBATION

Jeffrey further argues the trial court erred by imposing substance abuse treatment as a condition of his probation for his criminal mistreatment in the third degree conviction. The State concedes this argument and agrees the court imposed the condition in error; it was "most likely a scrivener's error." Resp't's Br. at 32. We accept the State's concession and remand for the trial court to strike the substance abuse treatment from Jeffrey's sentence.

While the trial court has broad discretion to impose probationary conditions on misdemeanors and gross misdemeanors, those conditions must be reasonably related to the crime. *State v. Hall,* 35 Wn. App. 302, 308, 666 P.2d 930 (1983). Here, the record fails to indicate that Jeffrey abused any substance or that substance abuse was related to the charges. We hold that the State's concession is proper and we remand for a correction of Jeffrey's judgment and sentence.

VI.   SAG ISSUES

Jeffrey raises several issues in his statement of additional grounds (SAG). Although a defendant is not required to cite to the record or authority in his SAG, he must still "inform the court of the nature and occurrence of [the] alleged errors," and we are not required to search the record to find support for the defendant's claims. RAP 10.10(c). Because Jeffrey does not provide support for his alleged errors, we do not reach his claims.

A.   Delays

Jeffrey argues that his case was delayed for two years. However, the record does not show that Jeffrey asserted his right to a speedy trial prior to trial, and thus Jeffrey is not entitled to relief.

B.    Lack of Time with Lawyer

Jeffrey argues that his lawyer did not spend enough time on his case. The record does not indicate how much time Jeffrey's lawyer spent working on his case. Matters outside of the record must be raised in a personal restraint petition. *See State v. McFarland*, 127 Wn.2d 322, 335, 338 n.5, 899 P.2d 1251 (1995).

C.    Outside-of-Court Conduct

Jeffrey argues that his lawyer had casual social contact with the judge and the prosecuting attorney. This information is not a part of the record and must be raised in a personal restraint petition. *See McFarland*, 127 Wn.2d at 338 n.5.

Jeffrey also complains of CPS's conduct outside of court, such as getting him fired from his job. Similarly, Jeffrey complains that the media released his personal information and that he received death threats from unidentified persons. Jeffrey complains that as a result of the media coverage of his case, he was refused service in a store. Jeffrey complains that the detectives told his family and friends that they would "put[ ] [the Trebilcocks] away for a long time." SAG at 5. Jeffrey complains that a person named Sue Barr "said a lot of un true [sic] stuff" on television. SAG at 3. This information is not a part of the record, and even if it were, we cannot provide a remedy for the actions of third parties outside of court.

D.    Credibility Arguments

Jeffrey argues that Dr. Tolby, Dr. Wu, and unspecified persons who were "involved with these too [sic] children when they were tooking [sic] from the blood mother" were biased and gave false testimony. SAG at 3. Jeffrey further argues that the children's case worker, Tina Day, lied. But we do not review weight or credibility issues on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

24

E.     Bifurcated Trial

Jeffrey argues that he wanted to be tried alone, rather than jointly with his wife. The record does not indicate that Jeffrey ever moved for a separate trial, and thus Jeffrey is not entitled to relief.

F.     Jury Trial

Jeffrey argues that he wanted a trial by jury. We have already addressed and rejected this argument above.

We remand for the trial court to strike the substance abuse treatment from Jeffrey's sentence. We otherwise affirm the Trebilcocks' convictions and sentences.

_____
Melnick, J.

We concur:

_____
Johanson, C.J.

_____
Maxa, J.