**FILED**
**APRIL 23, 2019**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,     )
                                     )     No. 34898-9-III
          Respondent,     )
                                     )
     v.                         )
                                     )
JONATHAN BROOKS HAWKINS,     )     UNPUBLISHED OPINION
                                   )
          Appellant.     )

KORSMO, J. — Jonathan Hawkins appeals from convictions for two counts of first degree child rape and one count of first degree child molestation. His appeal raises numerous arguments, including concerns about the length of time it took to reach trial, the use of evidence secured from Facebook via a search warrant, and admission of the child victim's statements. We affirm.

FACTS

The operative facts are largely procedural in nature, so the details of these offenses are largely unnecessary to the resolution of this appeal and will only be mentioned as needed to address issues presented. In brief summary, the police investigation began after a family friend reported Mr. Hawkins to Child Protective Services (CPS) following a Facebook conversation during which Mr. Hawkins discussed the family's "open"

lifestyle. He described how females existed to provide sexual service to males and that his one-and-a-half- and four-year-old daughters assisted their mother in sexual activities with him.

Following a ruse designed to get him outside, police arrested Mr. Hawkins outside of the Moses Lake hotel room in which the family was living. He sat in a police car for 40 minutes while a detective spoke with his wife, Caitlyn, and served a search warrant on the hotel room. An officer then drove Mr. Hawkins to the police station and placed him in an interview room to await the detective, Kao Vang. Several hours later, around 3:00 or 4:00 a.m., Detective Vang arrived at the interview room. Following advice of rights, Mr. Hawkins spoke with the detective for about 50 minutes. He was then booked into the Grant County Jail.

Charges were filed separately against both parents, while dependency proceedings were started by CPS. Mr. Hawkins was arraigned February 24, 2015, on charges of first degree child rape and first degree child molestation of four-year-old R.D.[1] Trial was scheduled for April 15.[2] Citing a trip out of town from April 2-10, and the need to interview 11 State's witnesses, defense counsel Stephen Kozer obtained a continuance of the trial until June 3, 2015, over the objection of the prosecutor. Kozer also requested

---

[1] R.D. was Caitlyn's oldest child and Jonathan's stepdaughter. The couple also had one-and-one-half- and six-month-old daughters.

[2] Mr. Hawkins initially could not make bond, but did obtain release on bond on October 6, 2015.

that the State schedule a *Ryan*[3] hearing in advance of trial to determine the admissibility

of R.D.'s statements, but asked for a delay of that hearing in order to obtain a defense

expert prior to the hearing. Throughout the proceedings, the prosecution had a plea offer

outstanding to Mr. Hawkins that would expire if a *Ryan* hearing was held.

Multiple continuances of the *Ryan* hearing and the trial were obtained by both

sides for varying reasons. The dependency proceedings resulted in R.D. and her siblings

being placed out of state, a circumstance that created access problems. An additional

problem arose when co-defendant Caitlyn Hawkins was sent to Eastern State Hospital to

determine her competency to stand trial.

A CrR 3.5 hearing was held July 1, 2015. The trial court found that Mr. Hawkins

voluntarily waived his right to remain silent after proper advice of rights. The court also

determined that there was no evidence indicating that the delay in advising Mr. Hawkins

of his rights affected his decision to talk to the detective.

The prosecution later reached an agreement with Caitlin Hawkins to testify against

her husband. As part of her "free talk" with the detectives, she showed them a lengthy

Facebook messaging conversation with her husband that stretched more than 12 months.

The messages included photographs and videos of sexual activities involving the family.

She allowed access to her Facebook pages in order to allow the officers to view the entire

---

[3] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

conversation. However, it was difficult to download the conversation due to its size.[4] As

a result, the police served a search warrant on Facebook to obtain the entire record.

The agreement with Caitlyn Hawkins faltered when the prosecution believed she

had been untruthful with investigators. The State withdrew from the agreement and

sealed the evidence obtained from her. When Facebook later responded to the search

warrant by providing nearly 2,000 printed pages, the prosecution also sealed that material

and declined to immediately turn any of it over to Mr. Hawkins.

On January 15, 2016, the date of the scheduled *Ryan* hearing, the defense moved

to dismiss under CrR 8.3(b) due to alleged government mismanagement involving the

late disclosure of the video recording of a second forensic interview of the child that had

occurred in November 2015. Clerk's Papers (CP) at 156-158. The court denied the

motion, determining that no substantial prejudice had occurred and that the defendant's

ability to present his defense had not been harmed. The court did continue the *Ryan*

hearing to the following month.

The *Ryan* hearing began February 25, 2016, six days before the scheduled trial

date. The court heard from the children's foster mother and from the original child

interviewer, Karen Winston, as well as from a defense witness who had conducted an

---

[4] The web browser only allowed access to a small number of messages at a time. It was a slow process to scroll through the entire conversation as each new page needed to be downloaded before viewing.

interview with R.D. in November 2015. The court also viewed the videotaped interview conducted by Ms. Winston, but did not hear from R.D. The issue of her competency to testify was reserved until trial. The court issued a written ruling on March 11 and found that statements made to Ms. Winston and the foster mother bore sufficient reliability to be presented at trial.

Shortly before the *Ryan* hearing, the prosecution entered into a plea agreement with Caitlyn Hawkins and turned over the 2,000 pages of Facebook material. Trial was continued into the summer of 2016. The defense filed motions to exclude testimony from Caitlyn, suppress the Facebook evidence, and for change of venue. The prosecution also was permitted to amend the information to add a count of first degree child rape of the one-and-a-half-year-old.

The motion to suppress was argued August 17, 2016. The court denied the motion to exclude testimony from Caitlyn Hawkins and withheld ruling on the suppression argument until the parties had filed additional briefing. Mr. Hawkins filed a waiver of jury trial on August 22, 2016. On September 1, the court entered an order denying the motion to suppress the Facebook evidence.

The case proceeded to bench trial September 14, 2016. The State presented testimony from two officers, a foster mother, Caitlyn Hawkins, and R.D. The child was found competent to testify and the forensic interview tape was admitted during her testimony by stipulation of the parties. Caitlyn Hawkins described the family's "open"

lifestyle and testified to instances of sexual contact she observed between R.D. and her husband. Excerpts from the Facebook conversation totaling nearly 50 pages also were offered during her testimony; the court conducted an ER 404(b) analysis on the record at the conclusion of trial and determined that the exhibits were highly probative and admitted them.[5]

The court returned its verdict on September 27, 2016. Mr. Hawkins was found guilty on all three counts relating to the two children. The court also found the existence of the two alleged aggravating factors—particular vulnerability and a pattern of sexual abuse.

Sentencing was held November 22, 2016. The court imposed high end minimum term sentences consisting of 216 months on the two rape convictions and 130 months on the molestation conviction. Although the court ordered the two rape sentences to run concurrently with each other, the court imposed an exceptional sentence by directing that the molestation sentence be served consecutively to the rape convictions.

Mr. Hawkins timely appealed to this court. A panel heard oral argument of his appeal.

---

[5] The court also entered a written ruling on the ER 404(b) argument as part of its bench verdict. CP at 454.

ANALYSIS

This appeal raises several arguments. After combining some of them by subject matter, we address them in the following order: (1) governmental mismanagement, (2) defendant's statement to police, (3) jury waiver, (4) Facebook messages, (5) R.D.'s statements, (6) evidentiary rulings, (7) sufficiency of the evidence.[6]

*Governmental Mismanagement*

Combining elements of CrR 8.3(b) and speedy trial analysis, Mr. Hawkins argues that the delay between his arraignment and his trial date was the product of prejudicial government mismanagement. His hybrid argument fails because he did not bring most of these arguments to the trial court and because he has not established any prejudice.

At the heart of this argument are two related concepts. CrR 8.3(b) allows the trial court to dismiss a prosecution with prejudice when, "due to arbitrary action or governmental misconduct," "there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." The trial court's rulings under CrR 8.3(b) are reviewed for abuse of discretion; the extraordinary remedy of dismissal is only appropriate when there has been such prejudice that no other action would ensure a fair trial. *State v. Garza*, 99 Wn. App. 291, 295, 994 P.2d 868 (2000). Discretion is abused

---

[6] Because there are not multiple errors, we decline to address appellant's cumulative error argument.

when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

A criminal defendant also has a constitutional right to a speedy trial guaranteed by both the Sixth Amendment to the United States Constitution and article I, § 22 of the Washington Constitution. The rights provided by the two constitutions are equivalent. *State v. Iniguez*, 167 Wn.2d 273, 290, 217 P.3d 768 (2009). We review de novo an allegation that these rights have been violated. *Id.* at 280. Because some delay is both necessary and inevitable, the appellant bears the burden of demonstrating that the delay between the initial accusation and the trial was unreasonable, creating a "presumptively prejudicial" delay. *Id.* at 283. Once this showing is made, courts must consider several nonexclusive factors in order to determine whether the appellant's constitutional speedy trial rights were violated. *Id.* These factors include the length and reason for the delay, whether the defendant has asserted his right, and the ways in which the delay caused prejudice. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). None of the *Barker* factors are either sufficient or necessary to demonstrate a constitutional violation. *Iniguez*, 167 Wn.2d at 283.

The overlap between these two protections is easily seen when the alleged prejudice involves a delayed trial, which is the argument raised by Mr. Hawkins. As a result, he essentially has to show a violation of his Sixth Amendment right in order to

establish that he was prejudiced by government mismanagement.  But, proving a

constitutional violation would obviate the need to argue CrR 8.3(b), while a failure to

establish prejudice would doom either argument.

An even bigger problem for this argument, however, is that most of these claims

were not presented to the trial court.  RAP 2.5(a) states the general rule that issues and

arguments that were not presented at trial will not be considered on appeal.  Washington

maintains an exception to these prohibitions for instances of "manifest constitutional

error."  RAP 2.5(a)(3).  However, violations of courts rules do not present instances of

constitutional error.  *State v. Templeton*, 148 Wn.2d 193, 220, 59 P.3d 632 (2002).  CrR

8.3(b) is a court rule.  It cannot be argued for the first time in this appeal.[7]

At the trial court, Mr. Hawkins argued that providing a copy of the November 20,

2015 child interview on January 14, 2016, constituted governmental misconduct.  That

was the sole basis for his CrR 8.3(b) motion.  CP at 156-158.  He has expanded that

argument in this appeal, attempting to complain about actions taken (or not taken) both

before and after the incident that was the basis for his motion in the trial court.  We limit

our consideration of his CrR 8.3(b) motion to that presented to the trial court.  There the

prosecutor had turned over a copy of the second forensic interview the day after she

---

[7] Similarly, Mr. Hawkins argues that the trial court erred in finding "good cause" for some of the trial continuances.  However, that standard applies to the time for trial rule, CrR 3.3.  He did not argue the rule in the trial court or in this court.  Accordingly, we will not address his "good cause" contention.

9

received it. Since that prompt delivery did not violate CrR 4.7, Mr. Hawkins cast the argument as a CrR 8.3(b) motion, complaining about the delay between the interview and law enforcement delivering the recording to the prosecutor.

The prosecutor indicated that she would not be using the interview at trial and did not intend to seek admission of any evidence from the November 2015 interview at the *Ryan* hearing. The trial court continued the *Ryan* hearing so that the defense could investigate the second interview, but denied the motion to dismiss since Mr. Hawkins could not establish that the late disclosure prejudiced his ability to have a fair trial. At the *Ryan* hearing, the *defense* sought to admit the second interview in order to impeach the first interview. The trial court considered the evidence, but then declined to use the information for impeachment.

The trial court certainly had a tenable basis for rejecting the CrR 8.3(b) motion. A delayed *Ryan* hearing did not impact the defendant's ability to have a fair trial. The delay was granted at defense request to allow an investigation into evidence that was not even being offered by the State. The disclosure of the interview did not compel the defense to give up its speedy trial right nor impact the trial defense. The CrR 8.3(b) motion was properly denied.

Mr. Hawkins also argues that his constitutional speedy trial right was violated by the numerous continuances beginning in July 2015, some of which resulted due to discovery provided during the on-going investigation. He summarily argues that all of

the *Barker v. Wingo* factors favor Mr. Hawkins and compel dismissal of the charges.

However, those factors do not support his position.

The time between charging and trial was nearly 19 months, a length of time

sufficient to raise constitutional speedy trial concerns. *Iniguez*, 167 Wn.2d at 283-284.

This factor does favor Mr. Hawkins.[8]  The second factor is the reason for the delay; the

analysis depends on whether the delay was purposeful or negligent and who was

responsible for it.  *Id.* at 284.  Except for a three week continuance granted over Mr.

Hawkins' objection on July 6, 2015, the remaining continuances were granted at the

request of Mr. Hawkins or with his agreement.  In light of this, Mr. Hawkins presents his

argument here as part of his mismanagement claim—that the failure to set the *Ryan*

hearing and the subsequent plea deal with the co-defendant (and resulting discovery)

compelled him to choose delay.  These arguments are, at best, a mixed bag.  There was

no reason to have an early *Ryan* hearing except for Mr. Hawkins' request; the hearing

could easily have been held at the beginning of trial as is customary in most jurisdictions.

The fact that the State erred in not obtaining an earlier hearing impacted Mr. Hawkins'

strategic decision to have an early *Ryan* hearing, but it did not itself delay the trial.

Similarly, the fact that Mrs. Hawkins became a witness against Mr. Hawkins—and

---

[8] Mr. Hawkins was released on bail seven months after his arraignment, and only three months after the challenged July trial continuance, thus reducing the oppressive nature of the delay.

11

thereby a source for voluminous new discovery[9]—was not a product of government

mismanagement. In the same vein, subsequent questions about her truthfulness and

competency to stand trial led to changes in the State's approach to Mr. Hawkins' case,

but did not impact the timeliness of his trial since the two cases were not joined. We

conclude that the second *Barker* factor does not weigh against the State. *Id*. at 294.

The third factor is whether Mr. Hawkins asserted his speedy trial right. *Id*. at 284.

Although Mr. Hawkins objected on one occasion, leading to a three week continuance, he

promptly obtained a continuance of the new date and was either responsible for, or in

agreement with, more than 12 months of subsequent trial continuances. His sole motion

to dismiss was predicated on the timeliness of the disclosure of the second child

interview, not on the timeliness of his trial date. This factor, too, does not weigh against

the State.

The final factor is the prejudice to the defendant resulting from the delay. *Id*. at

284-285, 295. This factor is designed to address the concerns resulting from a delayed

trial—incarceration, anxiety to the defendant, and possible impairment of the defense. *Id*.

Mr. Hawkins does not cite any of these factors in his argument; his sole argument is that

---

[9] This evidence already was accessible to Mr. Hawkins due to his status as a Facebook account-holder. Although defense counsel understandably needed time to investigate the records and determine what evidence the State had acquired, the substance of the messages were always available to Mr. Hawkins throughout the litigation; the evidence was not a surprise.

the delay helped the State improve its case to his detriment. This does not establish the relevant prejudice. This factor, too, does not weigh against the State.

The constitutional speedy trial claim fails. Although the lengthy delay was sufficient to trigger an inquiry, none of the *Barker* factors suggest that Mr. Hawkins was deprived of a fair trial. Delay is a common defense tactic in complex litigation. This was a complex case and the defense needed time to prepare in order to either accept the plea offer (which expired once a *Ryan* hearing was held), reach some other deal, obtain a dismissal of charges, or defend at trial. As in most cases with child victims of tender years, delaying trial runs the risk that a child will become a more competent witness or disclose more abuse, but has the benefit that the child (as here) may forget what happened or provide inconsistent information. The presence of a co-defendant makes the calculation even harder. On one hand, each defendant may have an incentive to turn against the other, but a united front can also bolster a joint defense where neither side helps the State. When an issue arises that is unique to one defendant, such as a competency concern, those problems and opportunities redouble. Throughout this litigation, the defense filed numerous motions, many of which could have changed the course of the case.

This case had all of those features and more. The calculus facing the defense was complex and necessarily needed time to weigh. The delay in reaching trial in this case resulted from the complex issues presented and the tactical choices made by the defense,

13

including the numerous motions that needed litigating.  It was not an oppressive delay that prejudiced Mr. Hawkins.

The delay between charging and trial was not the result of governmental mismanagement and did not constitute a violation of his speedy trial right under the constitution.

*Statement Given to Detective Vang*

Mr. Hawkins raises a series of related challenges to the admission of the statement he gave on the night of his arrest.  He primarily argues that the delay in advising him of his right to counsel rendered the statement involuntary and also constituted a violation of his rights under our court rules.  His failure to argue that point to the trial court dooms his claim here.

Prior to conducting a custodial interrogation, police must first advise a suspect of his or her rights, including the right to remain silent and the right to consult with an attorney prior to answering any questions.  *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  A defendant is in custody for purposes of *Miranda* when his or her freedom of action is curtailed to the degree associated with a formal arrest.  *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

In addition to whether a defendant properly waived his or her right to remain silent, a confession can still be involuntary due to the process by which it was obtained.

14

*Massey v. Rhay*, 76 Wn.2d 78, 79, 455 P.2d 367 (1969) (confession coerced by police is not admissible). Courts also apply a totality-of-the-circumstances test to determine if an individual knowingly and voluntarily confessed or instead confessed as product of police coercion. *State v. Unga*, 165 Wn.2d 95, 101, 196 P.3d 645 (2008). The defendant is entitled to raise the issue of voluntariness to the jury even if the court has admitted the statement. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.41, at 208 (4th ed. 2016); *State v. Huston*, 71 Wn.2d 226, 236-237, 428 P.2d 547 (1967).[10]

CrR 3.1(c) requires, in part, that a criminal defendant who has been taken into custody "shall immediately be advised of the right to a lawyer." Detective Vang was the sole witness to testify at the CrR 3.5 hearing. He testified that he advised Mr. Hawkins of his *Miranda* warnings and that Mr. Hawkins agreed to talk to him without ever asking for an attorney. CP at 445. Defense counsel argued that the delay between detention and interrogation, coupled with the fact that the defendant was probably tired, rendered the confession involuntary. Report of Proceedings (RP) (July 1, 2015) at 52. The court found that Mr. Hawkins was properly advised of his rights and voluntarily waived those rights, making the statement voluntary. CP at 446. The court expressly noted that the

---

[10] The defense did not argue the voluntariness issue at trial, despite the fact that Judge David Estudillo heard the trial, while Judge John Antosz heard the CrR 3.5 hearing.

passage of time between the initial detention and the interrogation "does not speak for itself in casting doubt on the voluntariness of the defendant's statements." CP at 446.

No evidence was presented suggesting that the passage of time somehow affected Mr. Hawkins' decision, after proper advice of rights, to talk to the detective without first speaking to an attorney. The hearing judge correctly noted that the passage of time *might* be a factor in a voluntariness decision, but the mere passage of time alone did not call into question the voluntariness of Mr. Hawkins' statement. In light of this record, the trial court simply did not err in concluding that his statement was voluntary.

Mr. Hawkins next takes issue with the possible failure of police to immediately advise Mr. Hawkins of his right to an attorney when taken into custody. We do not know whether or not that advice was given because the issue was not raised in the trial court. Neither the officer who detained Mr. Hawkins in the patrol car and later transported him to the police station, nor Mr. Hawkins himself, provided the court any information on the topic.[11] On this record, it simply is unknown whether CrR 3.1 was complied with.

As noted in our discussion of the trial delay arguments, the violation of a court rule is not an issue of constitutional magnitude that can be raised for the first time on appeal. *Templeton*, 148 Wn.2d at 220. Even if the claim of error was supported by the record, it is not reviewable in this court in the first instance.

---

[11] Detective Vang testified at the CrR 3.5 hearing that he did not know if Mr. Hawkins was arrested or advised of rights prior to their meeting at the police station.

Anticipating such, Mr. Hawkins argues that his counsel was ineffective for not raising CrR 3.1 as a basis for suppression. We consider this claim under long recognized standards. Counsel's failure to live up to the standards of the profession will require a new trial when the client has been prejudiced by counsel's failure. *State v. McFarland*, 127 Wn.2d 322, 334-335, 899 P.2d 1251 (1995). In evaluating ineffectiveness claims, courts must be highly deferential to counsel's decisions. A strategic or tactical decision is not a basis for finding error. *Strickland v. Washington*, 466 U.S. 668, 689-691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under *Strickland*, courts apply a two-prong test: whether or not (1) counsel's performance failed to meet a standard of reasonableness and (2) actual prejudice resulted from counsel's failures. *Id*. at 690-692. When a claim can be resolved on one ground, a reviewing court need not consider both *Strickland* prongs. *Id*. at 697; *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

Here, Mr. Hawkins can establish neither prong of *Strickland*. Without knowing whether or not the advice of rights was given to Mr. Hawkins by the first officer, there is no way of knowing if trial counsel even erred by failing to raise the CrR 3.1 issue. But even if there was error, Mr. Hawkins also has failed to establish that he was prejudiced by the failure to raise the issue. For several reasons, there is no indication that the failure to immediately advise Mr. Hawkins of the right to counsel mattered. First, when he was advised of his rights, including the right to consult with an attorney, Mr. Hawkins agreed to waive all of those rights and speak to the detective. Second, he presented no evidence

that he would have asserted the right to counsel if he had been notified earlier in the evening.

Most importantly, the trial court was aware of the delay between being taken into custody and the interrogation, but also noted that no evidence suggested the issue was one of import. When advised of rights, Mr. Hawkins immediately waived the right to remain silent and conversed with the detective. In light of that fact, it is highly unlikely that a delayed warning had any impact on his decision to speak. Accordingly, Mr. Hawkins has not established that his counsel either erred or that he was prejudiced by the failure to independently raise the CrR 3.1 issue.

Mr. Hawkins has not established that the admission of his statement to Detective Vang violated any of his rights under the constitution.

*Jury Waiver*

Mr. Hawkins next argues, very briefly, that his waiver of the right to jury trial did not waive his right to a jury determination of the existence of aggravating circumstances. We very briefly reject that claim.

A waiver of the right to jury trial is a waiver for all purposes. *State v. Trebilcock*, 184 Wn. App. 619, 632, 341 P.3d 1004 (2014). A defendant who waives the right to a

18

jury trial also waives the right to have a jury decide the existence of any aggravating factors. *Id*. at 631-634.[12] This claim is without merit.

*Facebook Search Warrant*

Mr. Hawkins next challenges the search warrant used to obtain the Facebook messages, arguing that it lacked probable cause and particularity. We disagree.

Probable cause to issue a warrant is established if the supporting affidavit sets forth "facts sufficient for a reasonable person to conclude the defendant probably is involved in criminal activity." *State v. Huft*, 106 Wn.2d 206, 209, 720 P.2d 838 (1986). The affidavit must be tested in a commonsense fashion rather than hypertechnically. *State v. Stenson*, 132 Wn.2d 668, 692, 940 P.2d 1239 (1997); *State v. Partin*, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977). The existence of probable cause is a legal question which a reviewing court considers de novo. *State v. Chamberlin*, 161 Wn.2d 30, 40, 162 P.3d 389 (2007). However, despite that standard of review, appellate consideration of a search warrant is not entirely a question of law. "Great deference is accorded the issuing magistrate's determination of probable cause." *State v. Cord*, 103 Wn.2d 361, 366, 693 P.2d 81 (1985). Thus, even if the propriety of issuing the warrant was debatable, the deference due the magistrate's decision

---

[12] A charged aggravating factor is similar to an element of the offense and cannot be ignored when pleading guilty. The right to plead guilty is a right to plead guilty as charged. *State v. Bowerman*, 115 Wn.2d 794, 799, 802 P.2d 116 (1990).

would tip the balance in favor of upholding the warrant. *State v. Jackson*, 102 Wn.2d 432, 446, 688 P.2d 136 (1984).

Both the Fourth Amendment to the United States Constitution and article I, § 7 of the Washington Constitution require that a search warrant describe with particularity the place to be searched and the items to be seized. *State v. Riley*, 121 Wn.2d 22, 28 n.1, 846 P.2d 1365 (1993); *State v. Friedrich*, 4 Wn. App. 2d 945, 959, 425 P.3d 518 (2018). The purposes of this requirement include avoiding general searches and eliminating the seizing officer's discretion concerning what to seize. *State v. Perrone*, 119 Wn.2d 538, 545-546, 834 P.2d 611 (1992).

Here, the search warrant issued to find evidence of first degree child rape and first degree child molestation. CP at 258. Mr. Hawkins challenges probable cause on the basis that the search warrant affidavit did not reference sex with children or evidence of the charged offenses. Br. of Appellant at 42. Although the affidavit does not provide any details of sexual activity involving R.D., it does provide evidence from which the magistrate could conclude that evidence of child sexual abuse was contained within the messages.

Sergeant B.L. Jones of the Moses Lake Police Department authored the affidavit in support of the search warrant. He included within that affidavit portions of an earlier affidavit he had filed in support of the original search warrant, including screen shots of the Facebook messaging conversation between Mr. Hawkins and the friend who reported

the family to CPS. That information was supplemented with information from the subsequent investigation, such as the police interviews with Mr. and Mrs. Hawkins and the officer's observations of the contents of the Facebook conversation, including "sexually explicit" videos exchanged by the couple among the messages. The sergeant described the videos as including Mrs. Hawkins and her daughters "in different states of undress with breasts and genitals exposed." CP at 262.

The original Facebook conversation referenced in the affidavit explained how R.D. was "learning by example" from watching her mother and father engage in sexual activities, including "how to pleasure the sack and prostate." The affidavit also included admissions by both the mother and the father that the four-year-old had been in contact sexually with the father and had assisted in "milking" him. CP at 263. The "milking" process was described in a Facebook message included in the affidavit as the regular "release" of "sperm and what we call milk." CP at 265. Mr. Hawkins described the released material as "very healthy for the female to eat" and "should be the majority of the females [sic] diet." CP at 265.

In sum, the affidavit described a crime of first degree child molestation (four-year-old having sexual contact with adult male), showed that Mr. Hawkins freely discussed with a friend the couple's sexual life and their training of the daughters to live a lifestyle of sexual service to males, and indicated that the couple conducted a long-running and very extensive messaging conversation that included sexually explicit videos and videos

21

showing their children's genitalia.  It was reasonable for the magistrate to conclude that additional videos included among the messages might show the acknowledged sexual contact between Mr. Hawkins and R.D.  Probable cause existed to issue the warrant.

The particularity requirement is easily met.  The warrant expressly stated what Facebook was to provide—the "complete" message conversation between Mr. and Mrs. Hawkins on their identified Facebook accounts between January 31, 2014 and February 11, 2015, including *all* embedded images and videos.  CP at 258.  No one needed to sift amongst the voluminous conversations to determine what the warrant was designed to seize.  The warrant was very particular.

Although the warrant could have been written in a more-straightforward manner and with a clearer explanation[13] of what had been observed in the message conversation, we believe that the deference owed the magistrate supports the probable cause determination.  Because probable cause existed and the warrant clearly stated what was to be seized, the appellant's challenges to the warrant fail.

---

[13] For example, although the term "sexually explicit" is not vague, it generally requires reference to a statutory definition such as that found in chapter 9.68A RCW or other context to have clear meaning.  *See Friedrich*, 4 Wn. App. 2d at 961.  Here the context is supplied by the original Facebook message and other explanation found in the affidavit, but this issue would have been much simpler if the "sexually explicit" conduct was described for the magistrate.

*Child Hearsay Statements*

Mr. Hawkins also challenges the admission at trial of the hearsay statements of

R.D. related to Karen Winston in the first forensic interview and, later, statements made

to a foster parent. He contends that the child was not competent to testify and that the

court erred in its hearsay analysis. The trial court did not err in determining R.D. was

competent or in its consideration of the hearsay.

R.D. was four years old at the time that the sexual abuse was discovered and was

six when she testified at trial. RCW 5.60.020 provides that "every person of sound mind

. . . may be a witness in any action." Our statutes also proscribe testimony from the

incompetent. Among them are those "who appear incapable of receiving just impressions

of the facts . . . or of relating them truly." RCW 5.60.050(2). Prior to 1986, the "just

impressions" test applied only to children under the age of 10. LAWS OF 1986, ch. 195, §

2; *State v. Allen*, 70 Wn.2d 690, 691-692, 424 P.2d 1021 (1967) (citing former RCW

5.60.050(2)). As noted in *Allen*, the test of witness competency is intelligence rather than

age. 70 Wn.2d at 692. *Allen* summarized the child competency standards:

> The true test of the competency of a young child as a witness consists of the
> following: (1) an understanding of the obligation to speak the truth on the
> witness stand; (2) the mental capacity at the time of the occurrence
> concerning which he is to testify, to receive an accurate impression of it; (3)
> a memory sufficient to retain an independent recollection of the occurrence;
> (4) the capacity to express in words his memory of the occurrence; and(5)
> the capacity to understand simple questions about it.

*Id*.  It is the opponent's burden to establish that the child was not competent to testify.

*State v. S.J.W.*, 170 Wn.2d 92, 102, 239 P.3d 568 (2010).

RCW 9A.44.120 provides for the admission of hearsay statements uttered by a child under the age of 10 describing acts of sexual contact against the child.  To admit the statements at trial, the court must first find that the "time, content, and circumstances of the statement provide sufficient indicia of reliability."  RCW 9A.44.120(1).  If the court makes that finding, admissibility is further conditioned on either (a) the child testifying at trial, or (b) there is corroborating evidence of the act.  RCW 9A.44.120(2).

To assess reliability of the child hearsay statement(s), the *Ryan* court turned to the then-current confrontation clause standards for determining reliability.  *Ryan*, 103 Wn.2d at 175-177.  Those factors have been summarized on many occasions:

> (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statements, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the declarant's recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*State v. Kennealy*, 151 Wn. App. 861, 880, 214 P.3d 200 (2009) (footnote omitted)

(citing *Ryan*, 103 Wn.2d at 175-176).

Here, Mr. Hawkins first takes issue with the determination that R.D. was competent to testify, pointing to other pretrial interviews where she either did not

24

remember, or denied having seen, sexual activities occurring in her presence. He questions whether the second and third *Allen* factors were established.

He also rightly notes that we review the competency determination for manifest abuse of discretion. *State v. Woods*, 154 Wn.2d 613, 617, 114 P.3d 1174 (2005). Here, the court heard testimony from R.D. during trial and found her competent to testify. The forensic interview was then admitted by stipulation of the parties. RP (Sept. 15, 2016) at 797. The trial judge was impressed with R.D., recited many of the questions she had answered, and stated that she had "answered very good questions." *Id.*

Pointing to inconsistencies in her pretrial interviews, Mr. Hawkins argues that the trial court failed to consider the second and third *Allen* factors—whether the child had the ability to accurately perceive events and the memory to independently recall them. Although the pretrial interviews may suggest something about the child's capacity to perceive and ability to recall, he did not expressly argue those points to the trial judge. Given that the child did not recall the events when questioned in the courtroom, the pretrial interviews actually served as evidence that she *did* have capacity since they were evidence of her abilities at an earlier time closer to the abuse allegations. Trial counsel understandably did not argue that point and the trial judge cannot be faulted for failing to expressly address a point that was not argued.

It was the burden of Mr. Hawkins to persuade the court that the child was not competent. He failed to do so. On this record, he cannot demonstrate a manifest abuse of discretion.

With respect to the child hearsay ruling, Mr. Hawkins argues that the pretrial interview inconsistencies and disclosures of uncorroborated abuse in Oregon undercut the court's determination that R.D.'s statements were reliable. Hawkins does not conduct a review of all nine *Ryan* factors.[14] However, our job on review is to ascertain that the *Ryan* factors were substantially met. *Kennealy*, 151 Wn. App. at 881. In light of his lack of analysis, we are not inclined to delve deeply into the topic. The trial court prepared thoughtful written findings showing a careful analysis of the *Ryan* factors. CP at 423-428. We agree with the trial judge that, on balance, the bulk of the nine *Ryan* factors suggest reliability, not unreliability.

The trial court did not err in rejecting his argument that R.D. was incompetent to testify or in determining that her hearsay statements bore sufficient reliability to be admitted under the child hearsay statute.

---

[14] His argument appears predicated on establishing why the child hearsay evidence would have been erroneously admitted if we agreed with his argument that R.D. was not competent to testify. Since the trial court did not err in finding the child competent, his argument necessarily fails.

*Evidentiary Rulings*

Mr. Hawkins attacks, often on multiple grounds, several of the trial court's evidentiary rulings. He also argues that some of the rulings also violated his right to present a defense. He fails to establish any instance where the trial court abused its discretion.

Appellate review of trial court evidentiary decisions likewise is governed by well settled law. The decision to admit or exclude evidence is reviewed for abuse of discretion. *State v. Guloy*, 104 Wn.2d 412, 429-430, 705 P.2d 1182 (1985). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *Junker*, 79 Wn.2d at 26. In a bench trial, judges are presumed to follow the law and to consider evidence solely for proper purposes. *State v. Adams*, 91 Wn.2d 86, 93, 586 P.2d 1168 (1978); *State v. Miles*, 77 Wn.2d 593, 601, 464 P.2d 723 (1970); *State v. Bell*, 59 Wn.2d 338, 360, 368 P.2d 177 (1962).

Under both the Sixth Amendment to the United States Constitution and art. I, § 22 of the Washington Constitution, a defendant is entitled to present evidence in support of his defense. *State v. Strizheus*, 163 Wn. App. 820, 829-830, 262 P.3d 100 (2011). That right, however, does not include a right to present irrelevant or inadmissible evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). As the proponent of the evidence, the defendant bears the

27

burden of establishing relevance and materiality. *State v. Pacheco*, 107 Wn.2d 59, 67, 726 P.2d 981 (1986).

With these principles in mind, we turn to appellant's arguments. He initially contends that the trial court erred in admitting the Facebook messages, arguing that the lifestyle information contained therein was irrelevant under ER 401 and also constituted other bad acts that should have been excluded by ER 404(b). The trial court's written findings from the bench trial address this evidence. In relevant part, the findings expressly state that the "Facebook messages provide an insight into the defendant's philosophy about women and provide admissions about conduct he had engaged in with R.D." CP at 451.

The court admitted a very small portion of the Facebook evidence. Those portions were clearly relevant since they included the defendant's own admissions to sexual contact with R.D. The evidence of Mr. Hawkins' "philosophy about women" provided information supporting the testimony of Caitlyn Hawkins and the hearsay statements of R.D. because it provided context for the abuse. Mr. Hawkins believed that women existed to serve men and should be raised to understand that obligation. That evidence also provided a motive for the crime and explained why a man would openly engage in sexual conduct with his own stepdaughter.

The court did not abuse its discretion in admitting the highly relevant evidence. The record also reflects that the trial judge did not misuse the evidence. The written findings expressly note that the other evidence in the case was sufficient without the Facebook posts to establish the charge beyond a reasonable doubt. CP at 451. On this record, Mr. Hawkins cannot overcome the presumption that the trial judge considered the evidence only for proper purposes.

Mr. Hawkins next argues that the court erred by not excluding the testimony of Caitlyn Hawkins on the basis of spousal privilege. He acknowledges that the statutory privilege contains an exception applicable to this case, but argues that the trial court construed the statute too broadly. We disagree.

In part, the spousal privilege provides:

> A spouse or domestic partner shall not be examined for or against his or her spouse . . . without the consent of the spouse or domestic partner; nor can either during marriage . . . or afterward, be without the consent of the other, examined as to any communication made by one to the other during the marriage . . . . But this exception shall not apply . . . to a criminal action or proceeding for a crime committed by said spouse or domestic partner against any child of whom said spouse or domestic partner is the parent or guardian.

RCW 5.60.060(1).

This privilege is two-fold: a spousal competency privilege that prevents one spouse from testifying against the other, and a communications privilege forbidding one spouse from disclosing communications from the other spouse. *State v. Thornton*, 119

29

Wn.2d 578, 580, 835 P.2d 216 (1992). The exception, however, is equally broad and applies to "a criminal action" against the spouse for a crime committed against a child in the defendant's care. *E.g.*, *State v. Wood*, 52 Wn. App. 159, 163-165, 758 P.2d 530 (1988) (liberally construing exception to privilege in order to further legislative policy of protecting children from abuse).

The child crime exception to the spousal communication privilege is not limited to solely communications about the charged crime. Any limitation on the scope of one spouse's testimony against the other must be found in ER 401 or some other evidentiary rule. It is not found in the privilege statute.

Mr. Hawkins next contends that the trial court interfered with his ability to present a defense when it limited his cross-examination on two occasions. Because the court properly sustained the prosecutor's objections, there was no interference with his defense.

The first example he argues occurred when defense counsel attempted to cross-examine Detective Vang about the results of the forensic analysis of evidence seized from the hotel room. The prosecutor had not addressed the topic in her examination of the detective, and the court sustained the objection on the bases that the question called for hearsay and was beyond the scope of direct. The ruling was correct. One typically cannot question a witness about the results of another person's testing.[15] The test results

---

[15] We suspect the prosecutor would have stipulated to the admission of the report if the defense had intended to subpoena the laboratory technician.

were not a topic of the detective's testimony, so cross-examination on the topic also would have been beyond the scope of direct examination. For both reasons, the question was improper.[16]

Mr. Hawkins also argues that the trial court erred in ruling that two of his questions of Caitlyn Hawkins were vague. RP (Sept. 15, 2016) at 732. We disagree. The trial court did not prohibit Mr. Hawkins from cross-examining the witness about which statements Ms. Hawkins gave to the detective contained lies. He asked her several properly phrased questions on the subject. RP (Sept. 15, 2016) at 731-732. The trial court did not err by requiring him to ask all questions in proper form.

The actions in sustaining proper objections to improper questions did not infringe Mr. Hawkins' right to present his defense. *Jones*, 168 Wn.2d 713; *Hudlow*, 99 Wn.2d 1. This argument is without merit.

*Sufficiency of the Evidence*

Lastly, Mr. Hawkins challenges the sufficiency of the evidence to support the convictions and the aggravating factors. His challenge is atypical, however, because it attacks the sufficiency of the case without the evidence he believes was wrongly admitted

---

[16] The question was also of little import. No test results were introduced and there was evidence that many items were seized for testing. Counsel was free to argue in closing that the physical evidence did not support the testimony of Caitlyn and R.D.

at trial and on the basis that some of the evidence should have been discounted.[17]

Properly viewed, the evidence was sufficient.

Following a bench trial, "appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-106, 330 P.3d 182 (2014) (citing *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005)). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *Id*. at 106. In reviewing insufficiency claims, the appellant necessarily admits the truth of the State's evidence and all reasonable inferences drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Finally, this court must defer to the finder of fact in resolving conflicting evidence and credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Our sufficiency review is that dictated by the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307, 317-318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Specifically, the test for evidentiary sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. Washington likewise follows this standard. *State v. Green*, 94 Wn.2d 216,

---

[17] This challenge makes it unnecessary for us to restate the evidence supporting the convictions.

221-222, 616 P.2d 628 (1980). Under *Jackson*, the question presented is whether the trier of fact *could* find the element(s) proved, not whether it should have done so.

Adherence to these review standards leads us to reject Mr. Hawkins' argument. Here, the trial court carefully set forth the evidence it relied on in reaching its bench verdict. CP at 449-454. Our review of the testimony confirms the sufficiency of that evidence to support the convictions and the aggravating factors. His argument for discounting the testimony of Caitlyn Hawkins was properly made to the trial court. It is not an argument, however, for this court since it is not our function to reach a credibility determination contrary to that of the trial judge tasked with the obligation to assess credibility. *Camarillo*, 115 Wn.2d at 71.

Viewed from the proper prospective, the evidence was sufficient.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____  _____
Lawrence-Berrey, C.J.        Siddoway, J.